**United States Court of Appeals
for the Eighth Circuit**

| | |
|---|---|
| NATIONAL STONE, SAND AND GRAVEL ASSOCIATION, ET AL., *Petitioners*, | |
| v. | No. 24-2661 |
| MINE SAFETY & HEALTH ADMINISTRATION, ET AL., *Respondents*. | |

---

## MOTION FOR STAY PENDING JUDICIAL REVIEW

---

Petitioners National Stone, Stand & Gravel Association, *et al.* respectfully request a stay of the deadlines for complying with the Mine Safety and Health Administration's ("MSHA") Silica Rule, 30 C.F.R. § 60.1 *et seq.*, pending judicial review.[1] The Rule imposes severe restrictions on how mining operators can comply with the new, tighter permissible exposure limit ("PEL") for respirable crystalline silica. Yet, MSHA lacks evidence that operators can feasibly comply with those restrictions in place; the Rule mandates extensive, expensive medical monitoring far beyond what MSHA has authority to compel; and it creates a new government-run database of personal medical information for which MSHA did not comply with

---

[1] The deadline for coal mines to comply with the Rule is April 14, 2025. 30 C.F.R. § 60.1(b)(1). The deadline for metal and nonmetal mines to comply with the Rule is April 8, 2026. 30 C.F.R. § 60.1(b)(2).

basic rulemaking requirements. Coal mines are now facing steep, unrecoverable costs as the compliance deadline of April 14 looms.

Petitioners have diligently sought to obtain MSHA's response to a request for a pause on the compliance deadlines for months. Until recently, MSHA was unresponsive, and significant outreach with repeated contacts was necessary to obtain replies about routine case-scheduling matters. Having spent that time trying to work with MSHA to either obviate or clarify MSHA's position on this motion, petitioners must now seek emergency action.[2] Petitioners ask the Court to protect the nation's mines from unsustainable costs to comply with an unjustifiable rule.

The Sorptive Minerals Institute ("SMI") and Blue Mountain Production Company, petitioners in the consolidated case, consent to this motion. As of this filing, MSHA has not articulated a position on the requested stay.

## LEGAL STANDARD

This Court is empowered to grant this stay, to secure the status quo, by the Administrative Procedure Act ("APA"), 5 U.S.C. § 705;[3] the Mine Act, 30 U.S.C.

---

[2] Petitioners did not immediately seek a stay upon filing the case based on initial hopes of resolving the matter via settlement. However, settlement efforts were unavailing, and the litigation schedule was extended by disputes related to the forum for this case.

[3] Mine Act section 956 makes the APA inapplicable for some adjudications, but not rulemaking. *Oil, Chem. & Atomic Workers Int'l Union v. Zegeer*, 768 F.2d 1480, 1486-87 (D.C. Cir. 1985) ("[W]e think it evident that Congress meant to identify, and remove from the APA fold, only ... decisions 'in a matter other than rule making.'") (citation omitted). Were the APA or Mine Act not to authorize a stay,

§ 811(d); the All Writs Act, 28 U.S.C. § 1651; and its inherent authority.

This Court may, "to the extent necessary to prevent irreparable injury," "issue all necessary and appropriate process" to "preserve status or rights pending conclusion of the review proceedings." 5 U.S.C. § 705. This includes suspending compliance deadlines. *See Airlines for Am. v. Dep't of Transp.*, 110 F.4th 672, 674-75 (5th Cir. 2024) (staying a Federal Aviation Administration regulation). A stay request is assessed "by considering: (1) [W]hether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Id.* at 674 (quoting *Nken v. Holder*, 556 U.S. 418, 434 (2009) (alterations in original)). "The first two factors" are "the most critical." *Nken*, 556 at 434.

The Court's exercise of inherent authority to stay an agency action pending judicial review, *see Tesfamichael v. Gonzales*, 411 F.3d 169, 174 (5th Cir. 2005) (stay available where "the agency is the forum of initial decisionmaking and the 'initial judicial tribunal is a court of appeals.'"), "cannot be contrary to any express

_____

the All Writs Act would fill that gap. *See In re NTE Connecticut, LLC*, 26 F.4th 980, 987 (D.C. Cir. 2022) (asserting "'inherent' power under the All Writs Act to stay agency action in order to preserve its prospective jurisdiction" when statutory remedies are inadequate).

grant of or limitation" on the "court's power contained in a rule or statute." *Dietz v. Bouldin*, 579 U.S. 40, 45 (2016). The Mine Act does not bar the stay requested here, but rather expressly contemplates a reviewing court staying a rule. 30 U.S.C. § 811(d) (petition for review does not stay a standard "unless otherwise ordered by the court").

## RULE 18 COMPLIANCE

Petitioners have asked MSHA, through counsel, since late January whether MSHA would stay the Rule on its own, or would accept a stay from the Court. Petitioners have waited with growing concern. There was no definitive answer. As of today, MSHA does not have an Administrator appointed by the President; and meanwhile, it appears that substantial numbers of employees have departed (although many were possibly rehired) during late January and February.[4] Petitioners cannot wait any longer. In light of MSHA's lack of an Administrator, and its lack of personnel, filing a formal motion at MSHA to stay the Rule would be impracticable. *Cf. Breeze Smoke, LLC v. FDA*, 18 F.4th 499, 503 (6th Cir. 2021) (impracticability found "because ... the FDA can take months to consider an agency-level request for a stay."). Moreover, petitioners have effectively fulfilled

---

[4] Rebecca Rainey, "Trump's Federal Workforce Cuts Hit Labor Department Enforcement," Bloomberg Law (Feb. 24, 2025), at https://news.bloomberglaw.com/daily-labor-report/trumps-federal-workforce-cuts-hit-labor-department-enforcement.

Rule 18(a)(2)(A)(ii) by requesting a stay informally.

## ARGUMENT

The Silica Rule established a standard limiting exposure to respirable crystalline silica in mining operations. That standard is numerically (and superficially) like the standard established by the Occupational Safety and Health Administration ("OSHA"). But unlike OSHA's standard, MSHA's Rule contains harsher restrictions on traditional tools for controlling exposure and requires costly sampling and medical surveillance without regard to exposure or risk, ultimately making compliance far more challenging and unfeasible at many mining operations. Petitioners' Opening Brief (currently available in proof, pending the deferred appendix) explains those problems. MSHA's Rule is deeply arbitrary because MSHA had no rational justification for the additional restrictions and no evidence that the exposure limitations are feasible (as the statute mandates) with those restrictions included. The harm to mining operators is severe, irreparable, and imminent.

## I. LIKELIHOOD OF SUCCESS

"To prevail, Stay Petitioners must demonstrate that the [agency] likely 'acted arbitrarily, capriciously, or unlawfully.'" *Texas v. EPA*, No. 23-60069, 2023 WL 7204840, at *6 (5th Cir. May 1, 2023). Petitioners' Opening Brief shows they are likely to succeed on the merits of their challenge to the Silica Rule.

## A. Miner Rotation

The PEL established by the Rule is arbitrary and capricious given MSHA's restrictions on time-tested and efficient compliance methods. Among other things, MSHA's new restriction against worker rotation summarily reversed its own prior practice and broke with OSHA's comparable silica dust regulation (both of which allowed rotation to reduce exposure). In doing so, MSHA failed to consider "experience gained" under the Mine Act and "other health and safety laws." 30 U.S.C. § 811(a)(6)(A). MSHA did not acknowledge its decades of experience with miner rotation under its own prior silica regulations, nor did it consider that OSHA allows rotation to mitigate silica exposure, nor did it contemplate MSHA's experience with allowing rotation for reducing both non-cancer hazards (like noise) and cancer hazards (like radiation). Moreover, MSHA's restriction on worker rotation flies in the face of the Mine Act, which *requires* miner rotation in certain circumstances. *See* 30 U.S.C. § 811(a)(7) (a "mandatory standard shall provide" that in certain situations, miners "shall be removed from [hazard] exposure and reassigned."). Far from increasing the number of miners exposed to a hazard, worker rotation *reduces* health risks to miners because it decreases their cumulative exposure to hazards that could increase risks of silicosis or lung cancer. MSHA-2023-0001-1448, pp.4-5.

MSHA prohibited rotation as a method of compliance based on faulty

assertions.  First, MSHA claimed it does not allow job rotation against cancer risks.  Yet, MSHA ignored its own precedents and rules.  While MSHA has disallowed rotation for one particular carcinogen, it allows rotation for reducing exposure to others.  Second, MSHA claimed its mandate is to reduce worker risks, not increase the number of workers at risk.  This is contrary to the scientific evidence that MSHA itself acknowledged.  The health risk from silica is based on cumulative exposure, and the evidence in the record shows there is a threshold of exposure before there is appreciable risk.  Importantly, rotation has "historically … been used to lower miners' exposures" to silica and other hazards, 89 Fed. Reg. 28,218, 28,319 (Apr. 18, 2024), "can be as effective as engineering controls," 64 Fed. Reg. 49,548, 49,597 (Sept. 13, 1999), and is "typically less costly," *id*.  The evidence before MSHA established that engineering controls alone were not sufficient to ensure compliance with the new PEL, and that "[b]y adding administrative controls (or procedural practices), mines routinely achieve consistent compliance." 89 Fed. Reg. at 28,284.

MSHA ignored these facts and instead arbitrarily prohibited key administrative tools traditionally used to comply with exposure limits.  Remarkably, MSHA then relied on sampling data that baked in the benefits of rotation in reducing exposure to determine that a *prohibition* on rotation is both technologically and economically feasible.  MSHA cannot have it both ways.  It relied on circular logic

and ignored an "important aspect of the problem." *Red River Valley Sugarbeet Growers Ass'n v. Regan,* 85 F.4th 881, 890 (8th Cir. 2023).

## B. Respirators

The same is true of the Rule's restrictions on respirators. MSHA determined that respirators cannot be "used for compliance because they do not address the dust generation at the source." 89 Fed. Reg. at 28,337. But that justification is equally applicable to many engineering controls and essentially all administrative controls— controls which MSHA itself acknowledged are essential to compliance. MSHA failed to give a rational explanation for treating similar controls differently, and it similarly failed to provide evidence to support its criticisms of respirators (including "inconsistent or incorrect use" and "fit"). *Id.* While the Rule allows temporary use of respirators *after* the PEL is exceeded and when a miner is temporarily engaged in an activity that will lead to exposures above the PEL (like a brief stint in hazardous areas for maintenance), 30 C.F.R. § 60.14(a)(2),[5] that allowance demonstrates the Rule's irrationality: If respirators cannot provide sufficient protection against

---

[5] MSHA's brief asserts that respirators were already prohibited at coal mines as a means of compliance. MSHA Br. 9. That is not quite correct. The Mine Act says respirators "shall not be substituted for environmental control measures in the active workings." 30 U.S.C. § 842(h). Yet MSHA's own regulations specify that a mine operator is *supposed* to provide respirators to limit exposure when measurements suggest that a mine is at risk of exceeding the exposure limit but has not yet reached the point of violation, 30 C.F.R. § 70.206(e)—roughly analogous to the window between the action level and the PEL in MSHA's new Rule.

overexposure for the reasons identified by MSHA, then the Rule's exceptions are the situations where respirators would be *least* appropriate. But respirators *are* effective. Accordingly, MSHA's reasoning was internally inconsistent, and this Court "can[not] … uphold agency action that is internally inconsistent." *Firearms Regul. Accountability Coal., Inc. v. Garland*, 112 F.4th 507, 520 (8th Cir. 2024).[6]

## C. Feasibility

MSHA also fatally erred when assessing the Rule's feasibility pursuant to 30 U.S.C. § 811(a)(6)(A). "Feasible," the Supreme Court has said when interpreting the OSH Act, means "capable of being done." *Am. Textile Mfrs. Inst. v. Donovan,* 452 U.S. 490, 508-09 (1981). But MSHA's data baked in the presence of controls the Rule forbids, and MSHA failed to present any evidence that any mine is currently achieving the PEL across the board (as the new Rule requires). For instance, MSHA's data showed that the *average* sampling result at metal/non-metal mines was 49.1 $\mu g/m^3$, comparable to the new 50 $\mu g/m^3$ PEL. 89 Fed. Reg. at 28,278-79. If the average is at 50 $\mu g/m^3$, many sampling results were necessarily above that figure, and MSHA's data showed that many were substantially higher. Moreover, those data included samples from many mines that involve virtually no silica

---

[6] As Petitioners' Opening Brief pointed out, MSHA's diesel particulate rule expressly allows miners to use respirators for compliance with that rule. Op. Br. 35-36 (highlighting MSHA's "opportunistic inconsistencies"). MSHA failed to consider both its own experience with respirators and OSHA's, let alone offer a reasoned explanation for breaking with prior practice. *Id.* at 36-37.

exposure. The sampling results at mines with actual silica exposures were surely well above what MSHA acknowledged; by bundling all the data without acknowledging the differences, MSHA ignored the evidence before it. MSHA-2023-0001-1448, p.21.

The bottom line is that MSHA's data show many mines currently struggle to achieve the new limit on silica concentrations in the air being sampled outside of miners' personal protective equipment—even with the benefit of exposure-control mechanisms the Rule forbids. MSHA plainly acknowledged this reality when it reported that, "for some mines, consistently achieving" the action level "for all the miners it employs could present a substantial challenge." 89 Fed. Reg. at 28,288. Because every sample above the PEL constitutes a violation of the Rule, 30 C.F.R. § 60.10, MSHA's silence about whether *any* mine had achieved the PEL for *all* of its miners is deafening—and determinative.[7] The evidence before MSHA does not

---

[7] Petitioners' Opening Brief also notes that uncertainties in measuring sample concentrations compounds this issue—measurements can range by a factor of four or more, which means that the same mining situation can readily generate samples substantially above *and* below the PEL, even if the real concentration of silica is solidly below the PEL. *See* Op. Br. 12, 40, 44-48. Rather than acknowledging the measurement uncertainties by providing an error factor, and instead of explaining why an error factor was unnecessary or how failing to provide one would avoid inconsistency with MSHA's prior practice for other hazards like coal dust, MSHA merely insisted that silica measurements are accurate. This ran "counter to the evidence before the agency" and was so implausible that this decision "could not be ascribed to … the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

establish that mine operators can feasibly ensure that all miners across the entirety of even *one* mining operation can fall under the PEL (even *before* accounting for the Rule's new restrictions on compliance methods). So MSHA had no basis for concluding that compliance with the PEL is "capable of being done." *Am. Textile Mfrs.*, 452 U.S. at 509.[8]

### D. Objective Data

MSHA's final Rule also irrationally deviated from the terms of its proposed rule with respect to mine operators' sampling obligations. The proposed rule would have allowed a mine operator to avoid expensive sampling if "objective data" "confirms miners' exposures are below the proposed action level." 88 Fed. Reg. 44,852, 44,856 (July 13, 2023). "Objective data" would have meant "information such as air monitoring data from industry-wide surveys or calculations based on the composition of a substance that indicates the level of miner exposure to respirable crystalline silica associated with a particular product or material or a specific process, task, or activity." 89 Fed. Reg. at 28,322. OSHA allows using "objective data" for this purpose, which makes sense—if a mine's rock has little or no silica

---

[8] This Court is not bound by the out-of-Circuit "reasonabl[y] possib[le]" feasibility standard from *Kennecott Greens Creek Mining Co. v. MSHA*, 476 F.3d 946, 958 (D.C. Cir. 2007), which is inconsistent with the language in *American Textile*. But even if it were, the D.C. Circuit concluded in *Kennecott* that MSHA's allowance of "respirators if the exposure limits cannot be met by other means" was extremely important to the feasibility inquiry. *Id.* at 959. The Rule stripped away that stopgap, and so MSHA's reliance on *Kennecott* is misplaced. Op. Br. 41, 43-44.

embedded in it, mining it will not release large amounts of silica.

But MSHA summarily rejected this approach in the final Rule, asserting, for example, that objective data are "not likely to represent mining conditions closely resembling" those at a given mine.  *Id.* at 28,323.  That rationalization contradicted the plain terms of the "objective data" exception, which would have required data to "reflect mining conditions closely resembling, … the processes, types of material, control methods, work practices, and environmental conditions in the operator's current operations."  88 Fed. Reg. at 44,902.  MSHA's other rationalizations similarly contradicted its own proposal.  MSHA asserted that "objective data … may be too subjective."  89 Fed. Reg. at 28,323.  That sentence contradicts itself; and some of the data sources that MSHA purportedly fears are too subjective are National Institute for Occupational Safety and Health ("NIOSH") Health Hazard Evaluations and historical sampling data from MSHA itself.  Stating that black is white "is illogical on its own terms," which means it "is arbitrary and capricious."  *GameFly, Inc. v. Postal Regul. Comm'n*, 704 F.3d 145, 148 (D.C. Cir. 2013).

### E. Medical Examinations

The Rule creates new, broader obligations relating to medical examinations that far exceed the statute.  The Mine Act authorizes MSHA to "prescribe the type and frequency of medical examinations" to be provided by an operator "to *miners exposed to [identified] hazards* in order to *most effectively determine* whether the

health of such miners is adversely affected by such exposure." 30 U.S.C. § 811(a)(7) (emphasis added). Thus, under the Mine Act's plain terms, a miner must be "exposed to" the "hazard" at issue (here, respirable silica) for MSHA to impose the costs of a medical examination upon the mine operator. But the Rule requires medical examinations for *all* new miners, regardless of whether they have been exposed to respirable silica, or are even likely to have such exposure. 30 C.F.R. § 60.15(c). By definition, new miners (those who "begin[] work in the mining industry for the first time," *id.*) cannot possibly have been subjected to silica in mines before—and thus the Mine Act cannot and does not authorize MSHA to require mine operators to provide them with medical examinations.[9]

Separately, the Rule's medical examinations are not prioritized to "most

---

[9] MSHA's brief contends that "exposed to" means "unprotected from." The Court's personnel are probably unprotected from silica, but no ordinary English speaker would say those personnel are *exposed* to silica. The same is true at mines; not every mining operation involves silica exposure, and even at mines where silica is present, not every mine worker is actually exposed to it. But the medical examination requirements cover everyone, regardless.

Moreover, "Congress' use of a verb tense is significant in construing statutes," *United States v. Wilson,* 503 U.S. 329, 333 (1992), and Congress used the past-tense here. That implies a temporal limitation—a miner must experience being subjected to silica in the past before related medical examinations can be imposed. If MSHA's contrary interpretation were correct, that qualifying provision would be a nullity and lead to absurd results, *i.e.*, medical examinations could be imposed for any hazard at all without any limitation. *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 575 (1982) ("interpretations of a statute which would produce absurd results are to be avoided if alternative interpretations consistent with the legislative purpose are available."). The Court should reject MSHA's reading.

effectively determine" the effects of silica exposure on miner health. All new miners are required to receive medical examinations, whereas veteran miners are merely allowed to receive them. *See generally* 30 C.F.R. § 60.15. This gets the structure exactly backwards. The Rule cannot "most effectively determine" whether miner health is affected by silica by prioritizing medical examinations for unexposed miners over those with exposure that reasonably necessitates medical examinations. The Rule plainly failed to "consider an important aspect of the problem," and thus is arbitrary and capricious. *Red River Valley*, 85 F.4th at 886.

### F. Mandatory Reporting to the Government

Flagrantly disregarding privacy concerns (and the APA's rulemaking requirements), the Rule requires mining operators to provide chest X-ray imaging for miners *and* have the results reported to a government agency, specifically NIOSH. 30 C.F.R. § 60.15(d)(2). The purpose is simply to create a new government database of miners' health data. Whereas MSHA's proposal had acknowledged that "confidentiality regarding medical conditions is essential," 88 Fed. Reg. at 44,914, the Rule runs roughshod over that very interest without so much as a note about it. By ignoring an issue MSHA knew was essential, MSHA "entirely failed to consider an important aspect of the problem." *State Farm*, 463 U.S. at 43.

MSHA's proposal stated that confidentiality of medical records is of paramount importance. 88 Fed. Reg. at 44,914. But MSHA provided no notice that

it was considering mandating a new database or filing X-rays with the government. The public was not given a meaningful opportunity to warn MSHA during the rulemaking that its original views were correct—confidentiality of health information is indeed very important, and the mandatory database will inherently be biased precisely because MSHA disregarded that concern. By engaging in this bait-and-switch, MSHA did not give enough notice to "allow for informed participation by interested parties," and so it failed to provide the public with the opportunity to provide feedback required by the APA. *Citizens Telecomms. Co. of Minn., LLC v. FCC*, 901 F.3d 991, 1005 (8th Cir. 2018).

The privacy concerns are particularly salient today, with litigation underway in multiple courts contesting potentially improper access to databases that various agencies maintain with confidential personal information. As just one example, the Consumer Financial Protection Bureau has extensive data on individuals' credit-card purchases, and those data are now at risk of being disclosed. *See Nat'l Treasury Emps. Union v. Vought*, No. 1:25-cv-00381-ABJ, Doc. 87, at 7 (D.D.C. Mar. 28, 2025). Database breaches are increasingly common, yet MSHA did not consider or allow the public to comment on that point before finalizing the Rule. By not doing so, MSHA violated the APA's rulemaking requirements. These risks give extra reason to be cautious about creating another new database about individuals' confidential health information.

Finally, the challenge brought by SMI also is likely to succeed since OSHA, MSHA's sister agency, considered identical scientific evidence regarding silica toxicity and chose to exempt sorptive clays from the silica standard it promulgated a few years prior. 81 Fed. Reg. 16,286, 16,380 (March 25, 2016).

## II. IRREPARABLE HARM

Petitioners will be irreparably harmed without a stay of the April 14, 2025 and April 8, 2026 compliance deadlines pending this Court's review of the merits. While "[e]conomic loss, on its own, is not an irreparable injury so long as the losses can be recovered," *Padda v. Becerra*, 37 F.4th 1376, 1384 (8th Cir. 2022), the losses at issue here cannot be. "[T]he nonrecoverable costs of complying with a putatively invalid regulation typically constitute irreparable harm." *Airlines for Am.*, 110 F.4th at 677. The Supreme Court has confirmed that notion by ordering a stay of an Environmental Protection Agency rule based on a showing of irreparable harm that consisted primarily of compliance costs. *Ohio v. EPA*, 603 U.S. 279, 291-92 (2024). The other type of harm in *Ohio v. EPA* was lost business resulting from the compliance efforts, *id.*, and that type of harm is present here too. "[C]omplying with a regulation later held invalid almost always produces the irreparable harm of nonrecoverable compliance costs," such as those borne by petitioners here. *BST Holdings, LLC v. OSHA*, 17 F.4th 604, 618 (5th Cir. 2021) (quotation and emphasis omitted).

Without this Court's intervention, mine operators are forced to rework their operations in ways that will decrease their efficiency and cause the loss of other business opportunities—all to comply with an unlawful Rule. That, too, constitutes irreparable harm. *See Celsis In Vitro, Inc. v. CellzDirect, Inc.*, 664 F.3d 922, 930 (Fed. Cir. 2012) ("Price erosion, loss of goodwill, damage to reputation, and loss of business opportunities are all valid grounds for finding irreparable harm"); *see also id.* ("[T]he simple fact that one could, if pressed, compute a money damages award does not always preclude a finding of irreparable harm.").

Consider Alliance Coal, LLC and its independent operating subsidiaries (collectively referred to as "Alliance"). In the attached Declaration of Kenneth Murray, Alliance demonstrates that it will incur substantial compliance costs because of the impending April 14, 2025 compliance deadline for coal mines. "[A]s a direct consequence of the Final Rule" Alliance must develop revised mining processes, invest in new air sampling techniques, develop and implement new methods of controlling and monitoring miner exposure to respirable crystalline silica, provide additional medical examinations to miners, and hire "at least eight (8) dedicated research and development dust technicians" at an annual cost of $1,136,000—among a litany of other activities and costs necessitated by the Rule. Ex. 1 at 3-5. This has caused Alliance to incur "approximately $2.3 million of past and ongoing investments necessary for compliance." *Id.* at 3. Alliance further

estimates that in addition to future one-time expenses totaling $15,000,000 necessitated by the Rule, it will also need to spend approximately $1,900,000 annually for ongoing compliance. *Id.* at 4, 5. These are substantial costs for a coal mine.

Another coal mine operator, American Consolidated Natural Resources, Inc. ("ACNR"), will "need[] to invest approximately $516,967" across March and April 2025, and a further "$982,186 throughout the remainder of 2025 for ongoing compliance"—which may increase due to "other unknown costs and issues resulting from the lack of guidance from MSHA." Declaration of Edwin P. Brady, Ex. 2 at 5. Going forward, ACNR estimates future annual compliance costs of $1,499,155, which includes $327,235 in expenses that are "necessary to comply with the rule's provisions governing medical evaluations." *Id.* ACNR will also need to make "significant" future capital investments to comply with the Rule's prohibition on miner rotation, which "severely disrupts and inhibits a coal mine operator's ability to efficiently staff and assign tasks to its workforce." *Id.* at 6. Without a stay, this irreparable harm is certain and imminent because of the impending coal compliance deadline.

The Declaration of Michael C. Sheedy, Esq. on behalf of Phoenix Cement Company ("Phoenix") demonstrates that metal/non-metal mine operators will incur similar harm unless the April 8, 2026 metal/non-metal compliance deadline is

stayed.  To comply with the Rule, Phoenix hired a third-party Industrial Hygienist "at a cost of nearly $190,000" for sampling, monitoring, and controlling silica exposure. Ex. 3 at 2.  Phoenix anticipates hiring its own professional to perform this role at a future annual cost of "approximately $150,000," and it expects current "monitoring and compliance costs will increase by a factor of four at the minimum" as a result of the Rule.  *Id.*  These costs include future annual air sampling costs of "between $100,000 and $125,000" and future annual medical examination costs of $190,000.  *Id.* at 2, 4-5.[10]

At bottom, the Rule will cause these entities to incur extremely high, nonrecoverable compliance costs, will cause their operations to become less efficient, and will drive them to forgo other business opportunities because of the substantial investments of capital and time necessitated by the Rule.  *BST Holdings*, 17 F.4th at 618; *CellzDirect*, 664 F.3d at 930; *see also Ross Cnty. Water Co. v. City of Chillicothe*, No. 2:08-cv-735, 2009 WL 10679057, at *9 (S.D. Ohio Feb. 10, 2009) (irreparable harm found where movant "would be unable to serve customers adequately and efficiently" and so would "suffer not only monetary loss, but portions of business opportunity"); *cf. Rufo v. Inmates of Suffolk Cnty. Jail*, 502 U.S. 367,

---

[10] Moreover, sorptive clay companies represented by SMI are in the same extreme situation—it typically takes years to assess, develop, install, test and perfect appropriate, workable engineering and ventilation controls to achieve a standard that is half the current PEL.

396 (1992) (O'Connor, J., concurring) ("every dollar spent for one purpose is a dollar that cannot be spent for something else.").  To avoid this irreparable harm, this Court should stay the Rule's compliance deadlines while it reviews the Rule's myriad deficiencies.

## III.   HARM TO OTHER PARTIES AND THE PUBLIC INTEREST

The final two factors—substantial harm to other interested parties and the public interest—"merge when the Government is the opposing party." *Nken*, 556 U.S. at 435.  "'[I]n considering whether the issuance of a stay pending appeal will substantially injure the other party, the maintenance of the status quo is an important consideration in granting [or denying] a stay.'" *Kansas v. United States*, 124 F.4th 529, 534 (8th Cir. 2024) (citation omitted).  Here, petitioners merely seek maintenance of the status quo until this Court rules on the merits of their challenge. A stay of the Rule's compliance deadlines while this Court reviews the Rule will cause no injury to MSHA:  "any abstract 'harm' a stay might cause the Agency pales in comparison and importance to the harms the absence of a stay threatens to cause countless individuals and companies." *BST Holdings*, 17 F.4th at 618.  So too here.

As for the public interest, when a petitioner challenges agency action as arbitrary and capricious under the APA, a "high likelihood of success on the merits is a strong indicator that a preliminary injunction [or stay] would serve the public interest" because "[t]here is generally no public interest in the perpetuation of

unlawful agency action." *League of Women Voters of United States v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016). "To the contrary, there is a substantial public interest 'in having governmental agencies abide by the federal laws that govern their existence and operations.'" *Id.* (citation omitted). As demonstrated in the Opening Brief and above, petitioners have established a very high likelihood of success on the merits. The Rule is fatally flawed on several counts, and "it is 'far from clear that Defendants would benefit from a decision that would permit the Rule to take effect, only to be set aside months from now.'" *Cath. Legal Immigr. Network, Inc. v. Exec. Off. for Immigr. Rev.*, 513 F.Supp.3d 154, 177 (D.D.C. 2021) (citation omitted). Moreover, the impact of any stay here is reduced, because the government is restructuring NIOSH and cutting two-thirds of its staff, which will delay NIOSH's creation of the reporting database—thus effectively postponing the Rule's medical reporting provisions.[11]

A stay of the deadlines does not mean silica exposures go unregulated. There were standards in place, applicable separately to coal and to metal/non-metal mines as set forth in the Opening Brief, before the Rule. *See* 89 Fed. Reg. at 28,218. Compliance with those standards would remain mandatory even after the Court stays compliance with the newly onerous restrictions of the Rule.

---

[11] Alexander Tin, "RFK Jr.'s Layoffs Expected to Gut Worker Safety Agency NIOSH, Officials Say," CBS News (Mar. 31, 2025), at https://www.cbsnews.com/news/rfk-jr-layoffs-hhs-niosh-worker-safety-agency/.

"[A]n exhaustive analysis of the merits of the petitioners' claims" is not "appropriate at this initial stage"; instead, all that is necessary is that petitioners satisfy the traditional four-factor test for a stay. *Tesfamichael*, 411 F.3d at 178. Petitioners have done so here. This Court should stay the Rule's compliance deadlines pending judicial review.

## CONCLUSION

For the reasons set forth above, the Court should stay the April 14, 2025 and April 8, 2026 compliance deadlines in the Rule, pending this Court's review pursuant to the petition.

April 2, 2025

Respectfully submitted,

*/s/ Keith Bradley*
KEITH BRADLEY
PETER S. GOULD
KAYLA MARIE MENDEZ
717 17th Street, Suite 1825
Denver, CO 80202
T: (303) 830-1776
F: (303) 894-9239
keith.bradley@squirepb.com
peter.gould@squirepb.com
kayla.mendez@squirepb.com

MORGAN MILLER
2550 M Street NW
Washington, DC 20037
morgan.miller@squirepb.com

TREVOR PIROUZ KEHRER
555 South Flower Street, 31st Floor
Los Angeles, CA 90071
trevor.kehrer@squirepb.com

SQUIRE PATTON BOGGS (US) LLP

*Counsel for National Stone, Sand &
Gravel Association, et al.*

## CERTIFICATE OF COMPLIANCE

In compliance with the type-volume limit of Federal Rule of Appellate Procedure 27(d)(2)(A) and excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f), this document contains 5,194 words, as determined by the word-count function of Microsoft Office 365.

In compliance with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6), counsel prepared this document in 14-point Times New Roman font using Microsoft Office 365.

*/s/ Keith Bradley*
Keith Bradley

**CERTIFICATE OF SERVICE**

I certify that on April 2, 2025, I electronically filed this document with the Clerk of the Court for the United States Court of Appeals for the Eighth Circuit using the CM/ECF system. All parties are represented by counsel who are registered CM/ECF users.

*/s/ Keith Bradley*
Keith Bradley